Filed 11/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SARAH ANDERSON et al., | H045271 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 16CV297950) |
| v. | |
| CITY OF SAN JOSE et al., | |
| Defendants and Respondents. | |

In this appeal we decide whether a California charter city's policy for the sale of surplus city-owned land is preempted by the state's affordable housing law.

The dispute centers on the City of San Jose's passage of City Policy 7-13 (Policy 7-13), which appellants Sarah Anderson, Joana Cruz, Urban Habitat Program, and Housing California contend violates the Surplus Land Act (Gov. Code, §§ 54220-54233). The question is whether state constitutional authority granting charter cities plenary power over their municipal affairs allows the City of San Jose and its city council (together, the City or San Jose) in this case to adopt a policy for the sale of surplus municipal property that conflicts with the state law.

The trial court answered this question affirmatively. It ruled that in regulating how local government disposes of surplus property for the benefit of its residents, the Surplus Land Act addresses a decidedly municipal affair, not a statewide concern, and under the state Constitution does not preempt the City's policy. The trial court therefore sustained without leave to amend the City's demurrer to the relevant causes of action.

We will reverse. The Surplus Land Act advances state land use policy objectives by mandating a uniform approach to the disposition of local government land that is no

longer needed for government use.  By requiring municipalities to prioritize surplus land for the development of low- and moderate-income housing, the statute addresses the shortage of sites available for affordable housing development as a matter of statewide concern.  Because the statute also narrowly tailors the restrictions on local government to avoid unnecessary interference in the locality's affairs, it meets the test for statewide preemption.  We conclude that while a city's process for disposing of surplus city-owned land is typically a municipal affair, San Jose's policy here must yield to the state law.

## I.   BACKGROUND

Anderson and Cruz are two low-income individuals who rent housing in San Jose. Both live with their families in crowded conditions and struggle to afford rent, paying 50 percent or more of their income toward housing costs.  Anderson and her two minor children are a very low-income household according to the Department of Housing and Urban Development's (HUD) definition, earning less than 50 percent of the area median income.  Cruz, her husband, two minor children, and brother-in-law are an extremely low-income household according to HUD, earning less than 30 percent of the area median income.  Urban Habitat Program and Housing California are two nonprofit organizations whose stated goals include advocating for and helping to increase affordable housing locally, regionally, and in the case of Housing California, statewide.

San Jose is a charter city and municipal corporation formed under the laws of the State of California and governed by the city charter, enacted in 1965.  San Jose has taken various measures to expand affordable housing availability for its residents.  It imposes a housing impact fee of $17 per square foot on most newly constructed residential rental properties to support funding for affordable housing supply.  It also requires at least 15 percent of for-sale units in new residential development projects of 20 or more units to be set aside for sale at prices affordable to low- or moderate-income households.  This feature is part of San Jose's inclusionary housing ordinance, which the City successfully defended in a legal challenge that was considered by the California Supreme Court in

2

*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435 (*California Building*).

San Jose also has established procedures for the sale of city-owned property. In April 2016, city staff recommended that the city council update the City's procedures for the sale of surplus property to reflect changes to the Surplus Land Act (the Act) (Gov. Code, §§ 54220-54233)[1] as amended in 2014.[2]

The Act declares "that housing is of vital statewide importance to the health, safety, and welfare of the residents of this state and that provision of a decent home and a suitable living environment for every Californian is a priority of the highest order." (§ 54220, subd. (a).) It addresses the "shortage of sites available for housing for persons and families of low and moderate income" (*ibid.*) by providing that "surplus government land, prior to disposition, should be made available for that purpose" (*ibid.*). It applies to "every city, whether organized under general law or by charter" as well as counties and districts "empowered to acquire and hold real property." (§ 54221, subd. (a).) The 2014 amendments to the Act require, depending on the scenario, a minimum percentage of units to be made available at specified affordability levels when the surplus land is sold or leased to develop low- or moderate-income housing, or for general residential development of 10 or more units. (§§ 54222.5, 54233.)[3] We discuss the relevant history and provisions of the Act in greater detail in the Discussion, *post*, at II.B.2.c.

The City responded to its staff recommendations by adopting Policy 7-13, titled a "Policy for the Sale of Surplus Property With Provisions Relating to Affordable

_____

[1] Unspecified statutory references are to the Government Code.

[2] The Act was more recently amended by Assembly Bill No. 1486 (Assem. Bill No. 1486, Stats. 2019, ch. 664), as we discuss in part II.B.2.c of the Discussion, *post*. Because the 2019 amendments do not take effect until January 1, 2020, we summarize the law as it currently exists and as it existed at the time of the City's actions in this case.

[3] Statutes 2014, chapter 677 (Assem. Bill No. 2135), pages 4452-4455, sections 2, 3, 6, 7.

Housing." The stated purpose of Policy 7-13 is to "strengthen[] the ability for affordable housing developers to acquire surplus land" and to reinforce the "importance of promoting affordable housing within the City in addition to open space, and the development of educational institutions."

In adopting Policy 7-13, the city council committed to "generally follow" the amended Act as a means of promoting affordable housing within the City. It noted that the state law can serve "as an additional tool to support the development of affordable housing that is important for addressing the housing crisis in the area." The council at the same time observed that the 2014 amendments to the Act "may impact the value of real property to be sold by the City and . . . impede the City's power to determine the future use of parcels to be sold . . . ." In light of these concerns, the city council asserted that as a charter city San Jose had "plenary power over its municipal affairs" and was "not required to follow the . . . modified provisions of Government Code Sections 54220 et seq., pertaining to the sale of surplus real property by a local agency . . . ."

The City's updated policy, Policy 7-13, consequently departed from the Act in several key areas. Among these, it created a five-year exemption from affordable housing restrictions for high-rise rental developments in the downtown. It allowed City staff to request and obtain city council approval in specific cases for a property to be sold for use other than affordable housing, or for the City manager to modify the process for disposing of surplus property " 'to accommodate circumstances applicable to significant or unusual properties.' " It expanded the income range for those eligible for affordable for-sale units, enabling developers to sell at a higher sales price to moderate-income households. And it omitted the requirement that certain affordable housing restrictions be recorded in a covenant at the time the surplus land is sold.

## II.    PROCEDURAL HISTORY

Anderson, Cruz, Urban Habitat Program, and Housing California (together appellants) filed a verified petition for writ of mandate and complaint for declaratory and injunctive relief (petition) against the City shortly after the adoption of Policy 7-13.

The petition alleged that the City's policy "undercut the state law's mandate to make public land available for affordable housing in the City" and disproportionately harmed low-income residents and minorities. The first and second causes of action of the petition sought declaratory relief and a writ of mandate compelling the City to comply with the Act. The third and fourth causes of action alleged that the City policy violated state statutory law by discriminating against the development of housing intended for occupancy by very-low and low-income households (§ 65008) and by denying housing opportunities to protected classes based on race and ethnicity, disability, sex, and familial status (§ 12900 et seq.).

The City demurred to all causes of action. It contended that it was exempt from the Act under the home rule doctrine because the power to sell city property and determine how the property should be used falls within the City's exercise of authority over its own municipal affairs. Appellants responded that under the four-part test articulated in *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 (*California Fed. Savings*) and confirmed in *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 556 (*City of Vista*), the Act preempted contrary city policy. They identified the "shortage of affordable housing for lower-income households" as the subject of the Act for purposes of the trial court's inquiry under *City of Vista*. The City, however, argued that the appropriate inquiry was not about the state's interest in affordable housing but "about whether the state can try to further that interest by interfering in the City's sale of its own property . . . ."

5

In a written decision after oral argument, the trial court sustained the demurrer to the first and second causes of action without leave to amend.[4] The trial court rejected appellants' identification of the relevant subject matter, finding "the issue here is not an abstract concern regarding the shortage of affordable housing for low-income individuals, but rather [whether] the state can require a charter city to sell its own land in a particular way that supports providing affordable housing for low-income families." The court further distinguished the matter from other cases finding affordable housing to be a matter of statewide concern. In reference to *Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 307 (*Buena Vista*)—in which the appellate court rejected as "meritless" the contention that the home rule doctrine limited the Legislature from compelling charter cities, through the housing element of their general plans, to take action to address housing as a matter of statewide concern—the trial court explained that the Act "has a narrower focus" because it dictates "particular requirements about how to dispose of city land" and "does not allow charter cities to have the same level of discretion" in determining their municipal affairs. The trial court concluded that San Jose's disposal of its property was a "municipal affair" and not a statewide concern, rendering the Act inapplicable.

Appellants moved for reconsideration of the trial court's demurrer order pursuant to Code of Civil Procedure section 1008, subdivision (a). In support, they offered a proposed amended verified petition alleging additional facts to demonstrate that the Act addresses a concrete, not abstract, matter of statewide concern, that being the prioritization of sufficient sites for affordable housing development. The proposed amended petition alleged in detail the history and scope of California's affordable

---

[4] Only the applicability of the Act to the charter city, as alleged in the first and second causes of action, is at issue in this appeal. Although the trial court overruled the City's demurrer to the third and fourth causes of action, appellants dismissed those causes of action without prejudice before initiating the instant appeal.

housing crisis and related consequences for the state's economy and public health, the need for local government participation in freeing land for affordable housing development, and the role of charter cities like San Jose, which account for nearly half of California's population.

The City opposed reconsideration, arguing that the proposed amended petition merely sought to bolster an argument that the trial court had rejected. The trial court denied the motion for reconsideration, finding that appellants had failed to explain why the newly alleged facts were unavailable at the time the demurrer was filed.

Appellants filed a request to dismiss without prejudice the remaining causes of action, obtained final entry of judgment, and pursued this appeal.

## II. DISCUSSION

We determine whether the sale of surplus, city-owned land for affordable housing development falls within San Jose's home rule authority by applying the analytical framework set forth in *California Fed. Savings* and described in detail below. Our inquiry "turns ultimately on the meaning and scope of the state law in question and the relevant state constitutional provisions." (*City of Vista*, *supra*, 54 Cal.4th at p. 558.) *City of Vista* confirmed that this presents a legal question, not a factual one. (*Ibid.*) Accordingly, we exercise our independent judgment in interpreting the state law to decide whether it can be constitutionally applied to charter cities. (*Ibid.*) So too, we review de novo the trial court's order sustaining the City's demurrer without leave to amend to decide whether the proposed amended petition in this case states a cause of action as a matter of law.[5] (*Los Altos El Granada Investors v. City of Capitola* (2006)

_____

[5] The parties dispute whether this court can properly consider the allegations of the proposed amended petition, which appellants submitted with their motion for reconsideration after the trial court sustained the City's demurrer without leave to amend.

Our decision in this appeal rests primarily on the constitutional framework for resolving a conflict under the home rule doctrine and on the relevant legislative enactments. Appellants are nonetheless correct that we may consider the proposed (continued)

7

139 Cal.App.4th 629, 648.) In doing so, we assume the properly pleaded material allegations of the petition are true and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 (*Moore*).)

### A. Analytical Framework: California's Home Rule Doctrine

Article XI, section 5, subdivision (a) of the California Constitution provides that a city governed by charter "may make and enforce all ordinances and regulations in respect to municipal affairs, . . . and in respect to other matters they shall be subject to general laws. City charters . . . with respect to municipal affairs shall supersede all laws inconsistent therewith."

What is known as "home rule" thus "represents an 'affirmative constitutional grant to charter cities of "all powers appropriate for a municipality to possess . . ." and [includes] the important corollary that "so far as 'municipal affairs' are concerned," charter cities are "supreme and beyond the reach of legislative enactment." ' " (*City of Vista*, *supra*, 54 Cal.4th at p. 556, quoting *California Fed. Savings*, *supra*, 54 Cal.3d at p. 12.) The home rule doctrine enshrines charter cities' sovereignty over "municipal affairs." (Cal. Const., art. XI, § 5, subd. (a).) The doctrine "also implicitly recognizes state legislative supremacy over matters not within the ambit of that phrase [municipal

amended petition, because our review on appeal from the judgment of dismissal after the sustaining of a demurrer necessarily encompasses consideration of any possible amendment that could cure the purported pleading defect. (C*ity of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.) This procedural posture allows courts to consider, for the first time on appeal, allegations in proposed amended pleadings. A recent California Supreme Court decision is confirmatory. (*Goonewardene v. ADP*, *LLC* (2019) 6 Cal.5th 817, 833 [reviewing court "must assume the properly pleaded facts contained in the [*proposed sixth* amended complaint] are true" where the trial court sustained the defendant's demurrer to the *fifth* amended complaint and entered a judgment of dismissal, but in the intervening time the plaintiff sought reconsideration and permission to file the proposed sixth amended complaint].)

affairs]." (*California Fed. Savings*, *supra*, at p. 13.)  This "countervailing dimension" of the home rule doctrine led the court in *California Fed. Savings* to "reject a static and compartmentalized description of 'municipal affairs' in favor of a more dialectical one." (*Ibid.*)  There emerged "the counterpoint of 'statewide concern' as a conceptual limitation on the scope of 'municipal affairs' and thus on the supremacy of charter city measures over conflicting legislative enactments." (*Ibid.*)

The resulting analytical framework steps the reviewing court through four criteria, ultimately forcing a choice "between conflicting state and municipal enactments when both stem from concerns rooted in their respective spheres of government." (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 13.)  As applied by the California Supreme Court in *City of Vista*, the framework comprises four parts.  "First, a court must determine whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.'  [Citation.]  Second, the court 'must satisfy itself that the case presents an actual conflict between [local and state law].'  [Citation.]  Third, the court must decide whether the state law addresses a matter of 'statewide concern.'  [Citation.]  Finally, the court must determine whether the law is 'reasonably related to . . . resolution' of that concern [citation] and 'narrowly tailored' to avoid unnecessary interference in local governance." (*City of Vista*, *supra*, 54 Cal.4th at p. 556, quoting *California Fed. Savings*, *supra*, at pp. 16-17, 24.)

Among these criteria, "the question of statewide concern is the bedrock inquiry through which the conflict between state and local interests is adjusted.  If the subject of the statute fails to qualify as one of statewide concern, then the conflicting charter city measure is a 'municipal affair' and 'beyond the reach of legislative enactment.'. . .  If, however, the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution, then the conflicting charter city measure ceases to be a 'municipal affair' pro tanto and the Legislature is not

9

prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments." (*California Fed*. *Savings*, *supra*, 54 Cal.3d at p. 17.)

**B.      Application of the *California Fed*. *Savings* Analytical Framework**

There is no dispute that the first two elements of the *California Fed*. *Saving*s test are met in this case. We briefly confirm the application of these criteria before addressing the question of whether the disposal of locally owned surplus property for affordable housing purposes is a matter of statewide concern. If so, we consider whether the provisions of the Act are reasonably related to resolution of that concern and narrowly tailored to avoid unnecessary interference in local governance.

### *1*. *The disposal of surplus city-owned property is a municipal affair*, *about which the City's policy and state law conflict*

There is no "defining formulation" of the phrase " 'municipal affairs' " within the meaning of the home rule provision of the state Constitution. (*California Fed*. *Savings*, *supra*, 54 Cal.3d at p. 6.) Although article XI, section 5, subdivision (b) identifies four core areas reserved for municipal governance, the disposal of city-owned property is not one of them. (See Cal. Const., art. XI, § 5, subd. (b) [nonexclusive enumeration of matters such as conduct of city elections and employment of city officials].)

In *City of Vista*, the court deemed it apparent that "the construction of a *city-operated facility* for the benefit of a *city's inhabitants* is quintessentially a municipal affair, as is the control over *the expenditure of a city's own funds*." (*City of Vista*, *supra*, 54 Cal.4th at p. 559.) The City contends that the disposal of surplus city-owned land for the benefit of its residents presents a similar example of local control over local assets. Indeed, it is within the City's authority to "purchase, lease, receive, hold, and enjoy real and personal property, and control and dispose of it for the common benefit." (§ 37350; *California Building*, *supra*, 61 Cal.4th at p. 461 [describing "municipalities' general broad discretion to regulate the use of real property to serve the legitimate interests of the general public and the community at large"].) Appellants concede that the City has a

10

legitimate interest in how it disposes of property no longer needed for government use and do not contest that San Jose's regulation of the sale of surplus city-owned land constitutes a " 'municipal affair' " under the analytical framework.

Both parties also recognize the " 'actual conflict' " between state law and the local policy. (*City of Vista*, *supra*, 54 Cal.4th at p. 556.) The Act expressly applies to charter cities. It directs "[a]ny local agency disposing of surplus land . . ." to comply with its provisions (§ 54222), defining " 'local agency' " in relevant part as "every city, whether organized under general law or by charter . . . ." (§ 54221, subd. (a).)

Policy 7-13 diverges from the Act in a few ways. Paragraph (B)(3) of Policy 7-13 states, for example, that for surplus land sold to a preferred entity to develop low- or moderate-income housing, no less than 25 percent of for-sale units must be made available at affordable prices for rental for lower-income households or for sale to moderate-income households for at least 55 years. The provision conflicts with section 54222.5, which requires *both* rental and for-sale units to be affordable to "lower income" rather than moderate-income households and requires the use restrictions to be recorded in a covenant against the surplus land at the time of sale, to run with the land and be enforceable against future owners and successors in interest.[6] (§ 54222.5.)

A similar schism affects the provisions pertaining to surplus land that is sold or leased on the open market rather than to a public entity for affordable housing development, which is then used to develop 10 or more units of residential housing. Policy 7-13, paragraph (C)(2) in that case requires that no less than 15 percent of units be sold at affordable cost for households earning up to 120 percent of area median income,

---

[6] Affordable housing cost, affordable rent, and income levels are defined in the Act by reference, respectively, to Health and Safety Code sections 50052.5, 50053, and 50079.5. The income level for "lower income households" is defined in Health and Safety Code section 50079.5 in relation to federal standards, or in the absence of applicable federal standards, as those earning no more than 80 percent of the area median income. (See also, *California Building*, *supra*, 61 Cal.4th at p. 447, fn. 3.)

targeting a higher-income bracket than the statute, which requires not less than 15 percent of the units to be sold at affordable housing cost to *lower-income* households (§ 54233).

The City's policy also exempts certain projects from its affordability restrictions and, by extension, from those of the Act. For example, Policy 7-13, paragraph (D)(2) exempts "high-rise rental development in the downtown" from affordable restrictions if the developer obtains necessary planning approvals and building permits before July 2021. And Policy 7-13, paragraph (D)(4) authorizes city staff to "request an exemption from this policy to meet another City goal and prioritize the sale of the surplus property for parks, schools, or other reasons, such as economic development." The exemption requires city council approval and written notice to those entities that, under the statute, would be notified of an offer to sell or lease of the surplus property.

We find these differences demonstrate an "actual conflict" between the Act and the City's surplus land policy under *California Fed. Savings*.

### 2. *The Surplus Land Act Addresses a Matter of Statewide Concern*

We arrive at the contested issue of statewide concern. It is a tricky question that hinges on "how the state Constitution allocates governmental authority between charter cities and the state." (*City of Vista*, *supra*, 54 Cal.4th at p. 557.) We are mindful of the California Supreme Court's further guidance on this point.

#### a. *"Statewide Concern" Is a Legal Determination Supported by Historical Fact*

The phrase "statewide concern," according to *California Fed. Savings*, is "nothing more than a conceptual formula employed in aid of the judicial mediation of jurisdictional disputes between charter cities and the Legislature, one that facially discloses a focus on extramunicipal concerns as the starting point for analysis." (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.) Like its " 'municipal affairs' " counterpart, it is not subject to factual certainty; both phrases represent "ultimate legal conclusions" (*ibid*.) that require courts to " 'allocate the governmental powers under

12

consideration in the most sensible and appropriate fashion as between local and state legislative bodies.' " (*Ibid*.)  Moreover, neither is mutually exclusive:  a court's invalidation of a charter city measure in favor of a conflicting state statute "does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation.  It means, rather, that *under the historical circumstances presented*, the state has a more substantial interest in the subject than the charter city." (*Id*. at p. 18, italics added.)

Our high court in *City of Vista*, *supra*, 54 Cal.4th at page 557, interpreted its task under this rubric as one that considers the "historical, and hence factual, realities" informing the legislation at issue but that "turns ultimately on the meaning and scope of the state law in question . . ." (*id*. at p. 558).  It explained that while courts "accord great weight to the factual record" compiled by the Legislature or established in trial court proceedings, those factual findings "are not controlling." (*Ibid*.)  Because both parties in this case claim to derive support from the application of these principles in *City of Vista*, we review the court's findings and rationale in some detail.

### b.  City of Vista's *Approach to Analyzing* "*Statewide Concern*"

In *City of Vista*, a labor union challenged a charter city measure proclaiming that the city would not comply with the state prevailing wage law on its public works contracts.  (*City of Vista*, *supra*, 54 Cal.4th at pp. 552-553.)  The prevailing wage law required government contractors on public works projects to pay workers a prevailing daily wage as determined by the Department of Industrial Relations for the locality and type of work.  (*Id*. at pp. 552, 555.)  The union argued that state law preempted the local measure, citing statutory and economic changes that had shifted construction wages and the related training of skilled workers from a localized to a regional matter and had elevated wage levels on public works to an issue of statewide concern.  (*Id*. at pp. 561-562.)

13

The California Supreme Court rejected the union's claim of statewide concern. It affirmed a series of earlier decisions holding that wage levels of contract workers constructing locally funded public works are a "municipal affair." (*City of Vista*, *supra*, 54 Cal.4th at pp. 558-559.) It was not convinced that the "modern integrated economy" had shifted the geosocial impact of a city's expenditure of funds on a local public work from a "purely local" to a "statewide concern." (*Id*. at p. 561.) It explained that "regional labor standards and the proper training of construction workers are statewide concerns *when considered in the abstract*." (*Ibid*.) This was insufficient to justify state interference in a local affair, because the question according to the court was "not whether the state government has an abstract interest in labor conditions and vocational training" (*ibid*.) but "whether the state can require a charter city to exercise its purchasing power in the construction market in a way that supports regional wages and subsidizes vocational training, while increasing the charter city's costs" (*id*. at pp. 561-562).

In drawing this conclusion, the California Supreme Court emphasized that "[a]utonomy with regard to the expenditure of public funds lies at the heart of what it means to be an independent governmental entity." (*City of Vista*, *supra*, 54 Cal.4th at p. 562.) It was not enough for the union to "justify state regulation of the spending practices of charter cities merely by identifying some indirect effect on the regional and state economies." (*Ibid*.) The court deemed this outcome consistent with previous decisions finding that compensation of charter city employees—or those of similarly independent governmental entities—was not a statewide concern. (*Id*. at pp. 562-564.)

The California Supreme Court also distinguished those aspects of the prevailing wage law that it found inconsistent with statewide preemption. It suggested that laws setting forth "generally applicable *procedural* standards" (*City of Vista*, *supra*, 54 Cal.4th at p. 564) were more likely to address a statewide concern and "impinged less on local autonomy than if they had imposed substantive obligations" (*ibid*.). But the prevailing wage law was not among those broader laws, given its "narrower application . . . to the

14

public works projects of public agencies" (*ibid*.) and its imposition of "substantive obligations on charter cities" (*id*. at p. 565) by setting wages.

Finally, the California Supreme Court reiterated that legislative declarations of statewide concern are not determinative. Although the court assigns such statements "great weight," "the resolution of constitutional challenges to state laws falls within the *judicial* power, not the *legislative* power." (*City of Vista*, *supra*, 54 Cal.4th at p. 565.) The court therefore found that the Legislature's express declarations about statewide concern and the payment of prevailing wages for workers on public works were not controlling. (*Ibid*.) It concluded that "no statewide concern has been presented justifying the state's regulation of the wages that charter cities require their contractors to pay to workers hired to construct locally funded public works." (*Id*. at p. 566.)

### c. The Shortage of Sites Available for Affordable Housing Development Is a Matter of Statewide Concern

Appellants, supported by amici curiae California Department of Housing and Community Development and Alliance of Californians for Community Empowerment, contend that this case yields the opposite result as *City of Vista* due to the presence of a statewide concern. Appellants claim that the Act patently addresses the "shortage of sites available for housing for persons and families of low and moderate income . . . ." (§ 54220, subd. (a).) Yet they assert the trial court failed to recognize the object of the statute and instead fixated on its impact on the municipality. They argue that this approach skewed the assessment of "statewide concern" and cannot be reconciled with the meaning of the Act or with judicial precedent recognizing that California's affordable housing shortage is a matter of statewide concern.

The City, supported by amicus curiae League of California Cities, responds that the trial court correctly patterned its analysis after *City of Vista*. It submits that the well-documented need for increased availability of affordable housing statewide does not meet the test for state interference in the City's management of city-owned resources to

15

accomplish housing and other goals tailored to city residents. The City compares the state's general interest in affordable housing to what the court in *City of Vista* found was an "abstract interest in labor conditions and vocational training." (*City of Vista*, *supra*, 54 Cal.4th at p. 561.) Since such a broad general interest does not amount to statewide concern under *City of Vista*, the City contends that the trial court correctly ruled that the "shortage of affordable housing for lower-income households" addressed in the Act does not constitute a matter of statewide concern.

The City also urges this court to reject what it suggests is appellants' effort to re-formulate the purported identification of "statewide concern" on appeal.[7] But because we exercise our independent judgment in interpreting the state law to identify whether it addresses a matter of statewide concern and can be applied constitutionally to the City (*City of Vista*, *supra*, 54 Cal.4th at p. 558), we are not bound by either party's prior formulations or the trial court's decision concerning the subject matter of the statute.

Turning to the merits, we find that the trial court misapprehended the nature of the statewide concern that underlies the Act and overlooked the relationship to California's housing crisis as documented in both legislative enactments and judicial decisions.

The Act advances state land use policy objectives by mandating a uniform approach to the disposition of land that local public agencies, including charter cities, no longer need. (§§ 54220, 54221.) In a nutshell, the Act establishes procedures requiring "[a]ny local agency disposing of surplus" government land to first notify in writing certain public entities of the offer to sell or lease the property for a designated purpose.

---

[7] Appellants identified the subject of the Act in their opposition to the demurrer in the trial court as "the shortage of affordable housing for lower-income households." On appeal, appellants present the subject of the Act as "a shortage of sites available for housing for persons and families of low and moderate income." (§ 54220, subd. (a).) Amicus curiae Department of Housing and Community Development offers yet another formulation of the object of the Act, which is "to advance particular state land use policy objectives through the opportunity of a public agency's disposition of real property."

16

(§ 54222; see *The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 613.) The listed purposes that require entity notification are "low- and moderate-income housing" (§ 54222, subd. (a)) and park and recreational or open space purposes (*id.*, subd. (b)), as well as purposes related to school facilities, enterprise zones, and infill opportunities (*id.*, subds. (c)-(e)). We are concerned here only with the "low- and moderate-income housing" aspects of the law.[8]

The Act's affordable housing objective reflects the Legislature's dual declaration that (1) the provision of suitable housing for Californians "is a priority of the highest order" (§ 54220, subd. (a)) and (2) "*there is a shortage of sites available for housing for persons and families of low and moderate income and that surplus government land, prior to disposition, should be made available for that purpose*" (*ibid.*, italics added).

These policy priorities evolved with the unfolding of the state's housing crisis, as may be seen in amendments to the Act, which was first enacted in 1968 to address "an identifiable deficiency in the amount of recreational land available to the public." (Stats. 1968, ch. 621, p. 1307, § 1.) In 1979, the Legislature added "low and moderate income housing" to the objectives of the statute. (Stats. 1979, ch. 942, §§ 1-6, pp. 3246-3247.) In 1982, the Legislature revised the statute's procedural requirements to explicitly prioritize affordable housing and further specified the "vital statewide importance" of housing and "shortage of sites available" for low- and moderate-income housing. (Stats. 1982, ch. 1442, §§ 1.5, 3, 4, 6, 9, pp. 5507-5509.) Again in 2014, the Legislature further revised the Act to include more rigorous provisions imposing a percentage of units to be set aside for sale or lease at affordable rates to lower-income

---

[8] Whether the other priorities and objectives for surplus land that are identified in the Act (see § 54220, subds. (b) [identifying "deficiency in the amount of land available for recreational purposes"], (c) [stating "importance of appropriate planning and development near transit stations"]) address a matter of statewide concern is not before us.

17

households.  (See §§ 54222.5, 54223, 54227, 54233; Stats. 2014, ch. 677 (Assem. Bill No. 2135) pp. 4454-4455, §§ 2-7.)  Most recently in 2019—shortly before the scheduled oral argument in this appeal—the Legislature approved legislation that amends and expands parts of the Act and that ties the Act to other state affordable housing laws. (Assem. Bill No. 1486, Stats. 2019, ch. 664 (eff. Jan. 1, 2020).)  While the most recent amendments have not yet taken effect and were not before the trial court in its consideration of Policy 7-13's possible preemption by state law, we find them relevant to our consideration of the legislative perspective on a matter of statewide concern.

In its current form, the Act requires the local agency disposing of surplus land to send an offer to sell or lease the property for development of low- and moderate-income housing to certain public entities and "housing sponsors" within the jurisdiction. (§ 54222, subd. (a).)  The local agency must first offer the surplus land for sale to entities that agree to make no less than 25 percent of the total units developed available to lower-income households at affordable housing cost or affordable rent for at least 55 years.  (§ 54222.5.)  Priority must be given to the entity that agrees to meet the affordable housing requirements, or when more than one entity satisfies that requirement, to the one that proposes to provide the greatest number of units at the deepest level of affordability. (§ 54227, subd. (a).)  If the local agency and housing entity cannot reach an agreement for sale or lease, then the surplus land can be marketed on the open market, subject to the exception that if the land is used to develop 10 or more residential units, no less than 15 percent of the total units must be made available at affordable housing cost or affordable rent to lower-income households.  (§§ 54223, 54233.)[9]

---

[9] Before the 2014 amendments to the Act, if good faith negotiations with a public entity did not result in mutually satisfactory terms for sale or lease of lower-income housing, then the land could be "disposed of without further regard" to the requirements of the Act.  (Stats. 1982, ch. 1442, § 4, p. 5508.)  Effective 2015, the failure to sell or lease to an entity releases the land "without further regard to [the Act], *except that*" the above-recited restrictions of section 54233 apply.  (§ 54223, italics added.)

18

We make two observations about the statute. First, the statutory language is unambiguous. It identifies the "shortage of sites available for" low- and moderate-income housing in California as its subject (§ 54220, subd. (a)) and addresses that subject by directing a process for "surplus government land . . . [to] be made available for that purpose" (*ibid*.). Second, the amendments have reinforced the affordable housing objective and most recently have established concrete procedures to ensure that surplus land available for affordable housing is in fact dedicated toward it. Most recently, the 2019 amendments restated the legislative findings to "declare[] that a shortage of sites available for housing for persons and families of low and moderate income *is a barrier to addressing urgent statewide housing needs* and that surplus government land, prior to disposition, should be made available for that purpose." (Assem. Bill No. 1486, Stats. 2019, ch. 664, § 1 (eff. Jan. 1, 2020) [amending § 54220, subd. (a)] italics added.) Together, the plain language of the statute and the more demanding requirements imposed upon local agencies signify that the Legislature has treated the subject of the Act, which we define in relevant part as the *shortage of sites available for affordable housing development*, as a matter of statewide concern.

Of course, the Legislature's characterization of statewide concern is not determinative, as the City here points out. (*City of Vista*, *supra*, 54 Cal.4th at p. 565.) Courts "may not simply abdicate to the Legislature" (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 286 (*County of Riverside*)) the determination of statewide concern and the corresponding assignment of power between local and state government (*ibid*.).

But neither may the trial court disregard the Legislature's pronouncements about the importance of the concern to the state or the supporting factual and decisional record, as appears to have occurred here. The standard is one of "defer[ence] to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution." (*California Fed. Savings*, *supra*, 54 Cal.3d at

19

p. 24; accord *City of Vista*, *supra*, 54 Cal.4th at p. 558 ["Courts accord great weight to the factual record that the Legislature has compiled"].) The basis for deferring to the legislative evaluation of a problem is that " 'the factors which influenced the Legislature to adopt the general laws may likewise lead the courts to the conclusion that the matter is of statewide rather than merely local concern.' " (*County of Riverside*, *supra*, 30 Cal.4th at pp. 286-287.)

In *California Fed. Savings*, the court explored the historical and regulatory record affecting the subject of the legislation at issue, which concerned state taxation of financial corporations. (*California Fed. Savings*, *supra*, 54 Cal.3d at pp. 8-10, 21-23.) In considering whether the City of Los Angeles could maintain an annual license tax on businesses within its jurisdiction—including those financial corporations covered by state law (*id.* at p. 11), the court followed the legislative and economic developments that underlay the state's expansion of the single state income tax to financial corporations (*id.* at pp. 19-20). It concluded, based on the historical and regulatory context, that the aggregate tax scheme of Los Angeles and other municipalities had "acquired a regulatory dimension they might not possess under different economic and competitive conditions" (*id.* at p. 23) and that "the income tax burden on financial corporations . . . including the component imposed by municipalities . . . [wa]s of sufficient extramural dimension to support legislative measures reasonably related to its resolution" (*id.* at pp. 23-24).

The California Supreme Court in *City of Vista* similarly considered the historical and economic context presented by the union for the prevailing wage law but found the connection to the asserted statewide interest too remote to overcome the charter city's municipal authority over contract wages. (*City of Vista*, *supra*, 54 Cal.4th at pp. 561-562; cf. *id.* at p. 571 (dis. opn. of Werdegar, J.) [finding majority improperly disregarded "prevailing wage law's far-reaching economic impact" on state's economy].) The court also weighed the degree to which the law impinged on autonomous municipal function. (*City of Vista*, *supra*, at p. 564.) To make that determination, the majority cited an earlier

20

decision on public employee compensation which "drew an important distinction between state *procedural* laws governing the affairs of local governmental entities (which by their nature impinge less on local affairs) and state laws dictating the *substance* of a public employee labor issue (which impinge much more on local affairs)." (*Id*. at pp. 563-564, citing *County of Riverside*, *supra*, 30 Cal.4th at p. 289.)

We believe that *City of Vista* does not dictate an equivalent result in this case because regulation of the disposal of surplus municipal land by the Act is not so attenuated as to have only an "indirect effect" (*City of Vista*, *supra*, 54 Cal.4th at p. 562) on the shortage of sites available for affordable housing development. As in *California Fed. Savings*, there is a robust legislative and historical context to support the state's interest in ensuring that local government prioritizes available surplus land for affordable housing. We briefly review this legislative and historical context to better consider the statewide concern and tension with the City's interests.

California's state housing goal is "[t]o provide a decent home and suitable living environment for every California family . . . ." (Health & Saf. Code, § 50003, subd. (b).) The obstacles are complex, as "there exists within the . . . state a serious shortage of decent, safe, and sanitary housing which persons and families of low or moderate income . . . can afford. This situation creates an *absolute present and future shortage of supply in relation to demand*, as expressed in terms of housing needs and aspirations, and also creates inflation in the cost of housing, by reason of its scarcity, *which tends to decrease the relative affordability of the state's housing supply for all its residents*." (*Id*., § 50003, subd. (a), italics added.)

This statutory language is from the late 1970's, but our Supreme Court recently observed that "[i]t will come as no surprise to anyone familiar with California's current housing market that the significant problems arising from a scarcity of affordable housing have not been solved over the past three decades. Rather, these problems have become

21

more severe and have reached what might be described as epic proportions in many of the state's localities." (*California Building*, *supra*, 61 Cal.4th at p. 441.)

Against this backdrop, the California Supreme Court in *California Building* examined legislative efforts to facilitate the provision of affordable housing. (*California Building*, *supra*, 61 Cal.4th. at pp. 444-445.) Primary among them is the comprehensive statutory scheme enacted in 1980 to "substantially strengthen[] the requirements of the housing element component of local general plans" known as the "Housing Element Law" (§§ 65580-65589). (*California Building*, *supra*, at p. 445.) In enacting the Housing Element Law, the Legislature recognized the shared responsibility of local and state government to facilitate affordable housing development. (§ 65580, subd. (d).) It also declared that "[d]esignating and maintaining *a supply of land and adequate sites suitable, feasible, and available for the development of housing sufficient to meet the locality's housing need for all income levels* is essential to achieving the state's housing goals . . . ." (*Id*., subd. (f).) The resulting statutory scheme "places responsibility upon a city to use its powers to facilitate the development of housing that makes adequate provision for all economic segments of the community, . . . including the city's allocation of the regional housing need as determined by the applicable regional council of governments." (*California Building*, *supra*, at pp. 446-447; see § 65584.)

The specific legal questions addressed in *California Building* and the intricacies of the Housing Element Law are not pertinent here;[10] we reference them solely to gain insight into the "statewide dimension" (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 18) that might justify superseding state legislation in our case. In this regard, it is

_____

[10] *California Building* involved a takings challenge by a building industry group to the City of San Jose's citywide inclusionary housing ordinance, which required new residential development projects to set aside a percentage of units for sale to low- or moderate-income households. (*California Building*, *supra*, 61 Cal.4th at pp. 441-443.) The California Supreme Court ultimately rejected the industry group's theory under the takings clause. (*Id*. at pp. 443-444.)

22

telling that within the past five years, our Supreme Court has pronounced the "problems arising from a scarcity of affordable housing" (*California Building*, *supra*, 61 Cal.4th. at p. 441) to be "more severe" (*ibid*.) than in the past. It is also noteworthy that the court's observation is hardly unprecedented.

Judicial decisions predating *California Building* have recognized the statewide dimension of the affordable housing shortage in relation to various impositions by the state into the realm of local affairs. (See *Green v. Superior Court* (1974) 10 Cal.3d 616, 625 [citing "enormous transformation in the contemporary housing market, creating a scarcity of adequate low cost housing in virtually every urban setting"]; *Buena Vista*, *supra*, 175 Cal.App.3d at p. 306 [finding "need to provide adequate housing" is a statewide concern and rejecting home rule challenge to state provision that mandated charter city to include certain actionable components in its "housing element"]; *Bruce v. City of Alameda* (1985) 166 Cal.App.3d 18, 22 (*Bruce*) ["locally unrestricted development of low cost housing is a matter of vital state concern"]; *Coalition Advocating Legal Housing Options v. City of Santa Monica* (2001) 88 Cal.App.4th 451, 458 (*City of Santa Monica*) [noting the Legislature and courts have declared housing to be a matter of statewide concern].)

Recent legislative efforts to address these challenges appear to reinforce the California Supreme Court's assessment in *California Building*. These include the 2014 amendments to the Act discussed above. In a seemingly coordinated fashion, changes to the Housing Element Law have increased state oversight and enforcement authority related to regional housing needs allocation plans that further objectives like increasing housing supply in an equitable manner and promoting an improved intraregional relationship between jobs and housing. (§§ 65584, subd. (d) [regional housing needs

23

allocation plan], 65585 [enforcement mechanisms].)[11]  The 2019 amendments to the Act mandated by Assembly Bill No. 1486, which take effect next year, further strengthen and expand these statewide mechanisms to address the affordable housing shortage.  (See generally, Assem. Bill No. 1486, Stats. 2019, ch. 664, §§ 1-13 (eff. Jan. 1, 2020) [amending Surplus Land Act].)

As noted earlier, the amendments to the Act hone the legislative findings to identify a shortage of available low- and moderate-income housing sites as "a barrier to addressing urgent statewide housing needs" and state "that surplus government land, prior to disposition, should be made available for that purpose."  (Assem. Bill No. 1486, Stats. 2019, ch. 664, § 1 (eff. Jan. 1, 2020) [amending § 54220, subd. (a)].)  While making no changes to the affordability restrictions set forth in sections 54222.5 and 54233 for surplus land slated for residential development, the amendments threaten significant penalties for noncompliance.  They require local agencies to report the proposed disposition of surplus land and negotiations with housing entities to the Department of Housing and Community Development before agreeing to any terms and require the state department to notify agencies of a violation.  (Assem. Bill No. 1486, *supra*, ch. 664, § 9 [amending § 54230.5, subd. (b)(1)].)  After giving agencies a "reasonable time" of not less than 60 days to respond to an identified violation (Assem. Bill No. 1486, *supra*, ch. 664, § 9 [amending § 54230.5, subd. (b)(2)(E)]), penalties may be imposed at the rate of "30 percent of the final sale price of the land sold . . . for a first violation and 50 percent for any subsequent violation" (Assem. Bill No. 1486, *supra*, ch. 664, § 9 [amending § 54230.5, subd. (a)(1)]).  They also authorize enforcement

---

[11] See, e.g., Statutes 2017, chapter 370, section 1, pages 2972-2973 (requiring state to review action by city or county that is inconsistent with an adopted housing element) and statutes 2019, chapter 159 (Assem. Bill No. 101) section 4, effective July 31, 2019 (increasing state enforcement authority over city or county for housing element violation).

actions by housing entities or individuals who "would have been eligible to apply for residency in any affordable housing developed . . . ." (Assem. Bill No. 1486, *supra*, ch. 664, § 9 [amending § 54230.5, subd. (a)(1)].) What is more, the amendments directly tie the Act to provisions of the Housing Element Law by requiring cities and counties to include disposition of surplus government sites in certain annual reporting requirements (Assem. Bill No. 1486, *supra*, ch. 664, § 14 [amending § 65400.1]) and to describe nonvacant government-owned land in the housing element inventory along with plans for disposition and compliance with the Act (Assem. Bill No. 1486, *supra*, ch. 664, § 15 [amending § 65583.2, subd. (b)(3)]).

The mandate for localities to assess affordable housing needs regionally and to include the disposition of surplus government land in that assessment is consistent with the state housing goal, which recognizes that the shortage of supply "creates inflation in the cost of housing, by reason of its scarcity, which tends to decrease the relative affordability of the state's housing supply for *all* its residents." (Health & Saf. Code, § 50003, subd. (a), italics added.) Regional coordination additionally serves other statewide interests the Legislature has identified, such as reducing adverse environmental effects in the form of increased greenhouse gas emissions due to insufficient low- and moderate-income housing in job centers. (§ 65584, subd. (a)(3).)

The information summarized above supports appellants' contention that the "shortage of sites available for housing for persons and families of low and moderate income" (§ 54220, subd. (a)) is a key driver of the state's affordable housing crisis. We also assume the truth of facts properly pleaded in the proposed amended petition (*Moore*, *supra*, 51 Cal.3d at p. 125; *Goonewardene*, *supra*, 6 Cal.5th at pp. 832-833), which specifically alleges "the cost and availability of land for development of housing that lower-income households can afford" as a major cause of the state's housing crisis. Even more to the point, the Act addresses this issue of undeniable statewide concern by

25

directing local agencies' disposition of surplus land in a way that prioritizes affordable housing development.

Accordingly, we find that as much as the City has a readily identifiable interest in the disposition of its real property, the well-documented shortage of sites for low- and moderate-income housing and the regional spillover effects of insufficient housing demonstrate "extramunicipal concerns" justifying statewide application of the Act's affordable housing priorities. (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 18.)

No doubt this determination chafes against the constitutional authority granted to San Jose as a charter city over its municipal affairs. (Cal. Const., art. XI, § 5, subd. (a).) But we believe it accords proper weight to the Legislature's findings and fulfills this court's "difficult but inescapable duty . . . to . . . 'allocate the governmental powers under consideration in the most sensible and appropriate fashion as between local and state legislative bodies.' " (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.)

We also believe that it treads within the boundary indicated by *City of Vista* for assessing statewide concern based on the degree to which the law impinges on local governing rights. (*City of Vista*, *supra*, 54 Cal.4th at p. 564.) "[A] state law of broad general application is more likely to address a statewide concern than one that is narrow and particularized in its application." (*Ibid*.) In *City of Vista*, the court viewed the prevailing wage law as having narrow application "only to the public works projects of public agencies" in contrast with a minimum wage law of broad application. (*Ibid*.) The prevailing wage law also imposed "substantive obligations on charter cities, not merely generally applicable procedural standards" (*id*. at p. 565), which "further undermine[d]" the assertion that the matter presented a statewide concern (*ibid*.).

Here, appellants contend that the Act is predominantly procedural in nature and grants local government significant control over land disposition choices, even with respect to provisions of the law that might be characterized as substantive. The City disagrees. It contends that, like the prevailing wage law in *City of Vista*, the Act dictates

26

how local government manages its own real property. The City avers that while earlier versions of the Act required only procedural compliance with notice to public entities about available surplus land, the statute now prescribes affordable housing over other uses and dictates specific affordability requirements, including units to be set aside, income ranges, and deed restrictions. (See §§ 54222.5, 54233.) The City argues that the Act's narrow application and substantive regulation counsel against a finding of statewide concern under *City of Vista*.

We find that the Act has a broad reach, applying to "[a]ny" local government entity empowered to acquire and hold real property, including cities—both charter cities and those organized under general law, counties, and districts. (§ 54221, subd. (a).)[12] Though its subject addressing the disposal of surplus agency land is particularized, the law's application is general in that it pertains to all manner of real property owned by local government agencies.[13] In this way it is different from the prevailing wage law, which applied only to the wages of contract employees on public works projects of public agencies. (*City of Vista*, *supra*, 54 Cal.4th at pp. 555, 564.)

We also find that the Act is neither entirely procedural nor substantive in effect. First, it mandates a process for notice and negotiations with preferred entities before a local agency can offer the property more widely. (§§ 54222, 54223, 54225, 54227.)

---

[12] Among other definitional changes, the 2019 amendments expand the definition of "local agency" to include a broader range of agencies and political subdivisions. (Assem. Bill No. 1486, Stats. 2019, ch. 664, § 2 (eff. Jan. 1, 2020) [amending § 54221].)

[13] The Act identifies certain categories of real property as exempt (§§ 54221, subd. (e), 54222.3), creating minor exceptions to the law's general application. We note that the 2019 amendments also broaden the definition of "exempt surplus land" to include additional types of land, including land "that is put out to open, competitive bid by a local agency, provided all entities identified in subdivision (a) of Section 54222 will be invited to participate in the competitive bid process, for" purposes of either a specified housing development or specified mixed-use development, both subject to substantial affordability restrictions. (Assem. Bill No. 1486, Stats. 2019, ch. 664, § 2 (eff. Jan. 1, 2020) [amending § 54221, subd. (f)(1)(F)].)

Next, it specifies substantive requirements and restrictions when surplus land is used for low- and moderate-income housing, or for general housing development of 10 or more residential units. (§§ 54222.5, 54233.) But unlike the automatic imposition of a uniform prevailing wage for all contract employees by region and trade (*City of Vista*, *supra*, 54 Cal.4th at p. 555), the substantive requirements and restrictions imposed by the Act arise only in select scenarios triggered by local agency determinations. For example, while the agency is required as a procedural prerequisite to notify entities of an offer to sell or lease the property and to give priority to affordable housing uses (§ 54222, subd. (a)), there is no mandate to sell to an affordable housing developer or to sell at less than market value. (§§ 54223 [local agency that cannot agree on satisfactory terms after good faith negotiation with preferred entity may dispose of land "without further regard" to the Act, except in case of residential development of 10 or more units], 54226 [the Act does not limit agency's power "to sell or lease surplus land at fair market value or at less than fair market value"].) In addition, the Act limits its application in the event of a conflict with "any other provision of statutory law" (§ 54226), providing a statutory safety valve for a substantive conflict. These backstop provisions remain largely unmodified by the 2019 amendments. (See Assem. Bill No. 1486, Stats. 2019, ch. 664, § 7 (eff. Jan. 1, 2020) [making nonsubstantive revisions to § 54226].)

We conclude from these provisions that the substantive measures are significant in their narrow spheres but do not dominate the generally applicable procedural standards. Nor does the Act's potential constraint on a charter city's ability to negotiate an optimal deal or to set a minimum floor for affordability in a surplus land conveyance necessarily preclude a finding of statewide concern. " '[G]eneral laws seeking to accomplish an objective of statewide concern' . . . 'may prevail over conflicting local regulations even if they impinge *to a limited extent* upon some phase of local control.' " (*County of Riverside*, *supra*, 30 Cal.4th at p. 287.) The threshold in *County of Riverside*, in which the California Supreme Court upheld a county's authority to disregard a state statutory

28

requirement that counties submit to binding arbitration of economic issues arising in union negotiations, was the locality's decisionmaking autonomy. The court explained that "*regulating* labor relations is one thing; *depriving* the county entirely of its authority to set employee salaries is quite another." (*Id*. at p. 288.)

In our case, the substantive measures do not "entirely" deprive the City of important discretion in deciding how and whether to dispose of a surplus parcel for affordable housing or residential development purposes. (Cf. *County of Riverside*, *supra*, 30 Cal.4th at p. 288.) As appellants point out, courts have upheld state regulation of municipal affairs on numerous occasions after identifying a countervailing statewide concern. (See, e.g., *California Fed. Savings*, *supra*, 54 Cal.3d at pp. 24-25 [statewide concerns related to financial market regulation were sufficient to justify elimination of local taxes on savings banks]; *City of Los Angeles v. Department of Health* (1976) 63 Cal.App.3d 473, 476, 479-480 [statewide concern that handicapped persons not be excluded from residential communities justified preemption of local zoning regulation concerning group homes for the disabled]; *Lippman v. City of Oakland* (2017) 19 Cal.App.5th 750, 764-765, 767 [state interest in fair resolution of building code violation appeals affecting property owners justified imposition of state-mandated appeal process on charter city]; *Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 799-801 [statewide interest in preventing race-based voter dilution overcame charter city's right to structure council elections using an at-large system].)

We are not persuaded by the City's effort to distinguish these and other cases by emphasizing that the statutes at issue imposed no substantive requirements on local government. As in our case, substance and procedure are not always dichotomous. For example, the conduct of citywide elections at issue in *Jauregui v. City of Palmdale*, *supra*, 226 Cal.App.4th 781, may be framed as procedural, but the court's order to enjoin certification of at-large city council election results based on application of the state's voting rights statute was unquestionably substantive. (*Id*. at pp. 799-801, 804.)

Other cases relied upon by the parties merely illustrate that it can be difficult to ascertain to what extent, if at all, the Act more severely impinges upon local sovereignty than the statutes in those cases. In *Buena Vista*, *supra*, 175 Cal.App.3d 289, the Housing Element Law required the city to adopt a five-year schedule of actions to achieve the housing element goals (§ 65583, subd. (c)) but at the same time afforded "considerable discretion in the manner of implementing programs" to reach those goals (*Buena Vista*, *supra*, at p. 307) and expressly refrained from imposing on certain aspects of local control, like spending (*ibid.*). In *Bruce*, *supra*, 166 Cal.App.3d 18, the court invalidated a charter city measure that mostly prohibited development of government-subsidized rental housing, finding it preempted by state law that prohibited local action discriminating against low-income residential development. (*Id.* at pp. 20-22.) And in *City of Santa Monica*, *supra*, 88 Cal.App.4th 451, the court rejected the charter city's attempt to limit second units in single-family residential zones as conflicting with state law that prohibited local agencies from " 'unreasonably restrict[ing] the ability of homeowners to create second units in zones in which they are authorized by local ordinance.' " (*Id.* at p. 455.)

The laws in these cases constrained but did not eliminate local discretion, such as that over the form of housing desired for an area in *Bruce* and *City of Santa Monica*, or the need to commit to concrete actions under the housing element in *Buena Vista*. Similarly, the Act in this case imposes minimum requirements for affordable housing development on surplus land (§§ 54222.5, 54233) but otherwise leaves to the City considerable discretion regarding disposal of the land.

A recent appellate case aptly summarized the balance of considerations when the law in question substantively regulates a municipal interest. *Marquez v. City of Long Beach* (2019) 32 Cal.App.5th 552, 556 (*Marquez*) involved a charter city's alleged failure to comply with the statewide minimum wage. The court evaluated the city's claim to home rule authority over its municipal affairs—including its " 'plenary authority'

30

[citation] to provide for the compensation of city employees" as set forth in the state Constitution. (*Id*. at p. 567.) The *Marquez* court acknowledged that the minimum wage requirements "are substantive regulations that directly implicate municipal interests in compensation of their employees." (*Id*. at p. 573.) It also acknowledged that "the Supreme Court has countenanced procedural laws encroaching on local authority more readily than substantive measures . . . ." (*Ibid*.) At the same time, the court reasoned that "the distinction between substantive and procedural measures is not determinative, and substantive laws displacing local authority over municipal affairs have been upheld by the courts." (*Ibid*.)

*Marquez* differentiated the substantive nature of minimum wage regulations from that of the prevailing wage law addressed in *City of Vista*. (*Marquez*, *supra*, 32 Cal.App.5th at p. 574.) It explained that "a prevailing wage law has a greater impact on local control . . . because by requiring payment of wages prevailing in an industry locally, the law is 'effectively a salary setting statute,' " whereas the minimum wage requirement "does not effectively determine the wage for all employment relationships it regulates, but rather, sets as a floor the lowest permissible hourly rate of compensation." (*Ibid*.) In this way "the impact of the minimum wage law is consistent with the Supreme Court's conclusion [that] 'the Legislature may regulate as to matters of statewide concern even if the regulation impinges "to a limited extent" ' on local control of municipal affairs." (*Ibid*., quoting *County of Riverside*, *supra*, 30 Cal.4th at p. 287.)

We agree with the court's assessment in *Marquez*. As applied here, the substantive measures of the Act set a floor, which limits a charter city's ability to reduce the percentage of units designated for sale or lease at the specified affordability levels when surplus land is sold or leased for residential housing purposes. (§§ 54222.5, 54233.) The regulation impinges " 'to a limited extent' " upon this aspect of local control (*County of Riverside*, *supra*, 30 Cal.4th at p. 287) but does not otherwise dictate terms or limit decisionmaking authority. (See *Marquez*, *supra*, 32 Cal.App.5th at p. 574.) The

31

court in *California Fed. Savings* employed similar reasoning when it found "[s]upport for the conclusion that the local taxation of savings banks is at present a subject of statewide concern . . . strengthened by the limited extent of the incursion made by" the state statute at issue. (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 24.)

We conclude that the Act's prioritization of surplus city-owned land for affordable housing purposes "demonstrably transcend[s] identifiable municipal interests" (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 17) and, under current circumstances, demonstrates that "the state has a more substantial interest in the subject than the charter city" (*id*. at p. 18). Framed more narrowly in accordance with *City of Vista*, we find that the state *can* require a charter city to prioritize surplus city-owned land for affordable housing development and subject a charter city to restrictions in the manner of disposal of that land, because the shortage of sites available for affordable housing development is a matter of statewide concern. (See *City of Vista*, *supra*, 54 Cal.4th at pp. 561-562; *California Fed. Savings*, *supra*, 54 Cal.3d at p. 18.)

### 3. *The Surplus Land Act Is Sufficiently Tailored to its Purpose*

The fourth and final part of our inquiry is two pronged. We must decide whether the state statute is " 'reasonably related to . . . resolution' " of the identified statewide concern (*City of Vista*, *supra*, 54 Cal.4th at p. 556) and is " 'narrowly tailored' to avoid unnecessary interference in local governance" (*ibid*.). (Accord, *California Fed. Savings*, *supra*, 54 Cal.3d at pp. 17, 24.) At this step the court considers " 'the sweep of the state's protective measures [which] may be no broader than its interest.' " (*Id*. at p. 25.) Put another way, "the state law must be reasonably related to the issue at hand and limit the incursion into a city's municipal interest." (*Lippman v. City of Oakland*, *supra*, 19 Cal.App.5th at p. 765.)

We have already assessed the sweep of the statute and extent of the incursion into the City's local affairs. The Act applies broadly to local government entities empowered

32

to hold real property but is tailored in subject: it addresses only surplus land held by a local government entity, defined as land "that is determined to be no longer necessary for the agency's use, except property being held by the agency for the purpose of exchange." (§ 54221, subd. (b).) Whether land is deemed "surplus" is entirely within the local government's discretion. If a local agency makes that determination, the statute's incursion into the agency's decisionmaking authority over *disposition* of the surplus land is much narrower.

The Act's most general prescription, requiring the agency to give written notice to certain public entities or housing sponsors of the offer to sell or lease the property for the purpose of developing low- and moderate-income housing (§ 54222), applies when the surplus land is being offered *for the purpose of developing affordable housing*. The statutory provisions that encroach more acutely and impose substantive constraints, such as requiring at least 25 percent of the units developed to be made available at affordable housing cost to lower-income households (§ 54222.5), take effect only if the local agency decides to sell or lease the land for that purpose. These measures have no application if an agency elects to sell or lease the surplus land for some other purpose, except if the agency sells the property on the open market and the new owner develops 10 or more residential units (§ 54233). The Act does not interfere with an agency's discretion over pricing; the City can dispose of surplus land at market rates. (§ 54226.) We find that the affordable housing measures—comprising the requirements of notice, prioritization, and minimum set-asides at specified affordability levels—are " 'narrowly tailored' to avoid unnecessary interference" in the affected local governance. (*City of Vista*, *supra*, 54 Cal.4th at p. 556.)

These measures also are reasonably related to the statewide concern articulated in the Act. Here, the "state's protective measures" (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 25) require local government agencies to prioritize available surplus land for affordable housing development (§ 54220, subd. (a)) and to adhere to minimum

33

set-asides at specified affordability levels when the land is developed for housing purposes (§§ 54222.5, 54233). These are reasonably related to and " 'no broader' " (*California Fed. Savings*, *supra*, at p. 25) in sweep than the state interest in reducing the statewide shortage of sites available for affordable housing development.

## C. Conclusion

In brief, we find that (1) the disposal of surplus city-owned land for the benefit of city residents is a municipal affair, (2) there is an actual conflict between the Surplus Land Act and the City of San Jose's Policy 7-13, (3) the shortage of sites available for affordable housing development is a matter of statewide concern, and (4) prioritizing surplus city-owned land for affordable housing purposes as required by the Act is reasonably related to the statewide concern and provides a narrowly tailored solution that does not unnecessarily interfere in local governance. (*City of Vista*, *supra*, 54 Cal.4th at p. 556; accord *California Fed. Savings*, *supra*, 54 Cal.3d at pp. 17, 24.)

Our results under the analytical framework do not mean that the City's surplus land policy is an inappropriate subject for municipal regulation, but rather "that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city." (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 18.) Having found that the statewide concern at present supersedes the City's home rule authority on the same subject, we conclude that the City must yield to state law in this case by complying with the affordable housing provisions of the Act.

## III. DISPOSITION

The judgment is reversed. The trial court is directed to vacate the order sustaining the City of San Jose's demurrer to the first and second causes of action and to enter an order overruling the demurrer to those causes of action. Appellants are entitled to recover their costs on appeal.

34

                                                    _____
                                                            Premo, J.



WE CONCUR:



_____
        Greenwood, P.J.



_____
        Elia, J.



Anderson et al. v. City of San Jose et al.
H045271

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 16CV297950 |
| Trial Judge: | Hon. Theodore C. Zayner |
| Counsel for Plaintiffs/Appellants:<br>Sarah Anderson, Joana Cruz, Urban<br>Habitat Program, Housing California | Bay Area Legal Aid<br>Rebekah Evenson<br>Cristina Peña Vazquez<br><br>Public Interest Law Project<br>Michael Rawson<br>Valerie Feldman<br><br>Public Advocates<br>Samuel Tepperman-Gelfant<br>David Zisser<br><br>Weil, Gotschal & Manges<br>Adrian Percer |
| Counsel for Amicus Curiae in support<br>of appellants | Attorney General of California<br>Xavier Becerra<br><br>Daniel A. Olivas<br>Senior Assistant Attorney General<br><br>Deborah M. Smith<br>Supervising Deputy Attorney General<br><br>Jessica E. Tucker-Mohl<br>Deputy Attorney General |
| Counsel for Defendants/Respondents:<br>City of San Jose<br>San Jose City Council | Office of the City Attorney<br>Richard Doyle<br><br>Nora Frimann<br>Assistant City Attorney<br><br>Maren J. Clouse<br>Sr. Deputy City Attorney |
| Counsel for Amicus Curiae in support<br>of respondents | Best Best & Krieger<br>Amy E. Hoyt<br>Gregg W. Kettles |

Anderson et al. v. City of San Jose et al.
H045271